UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

John Bratek,                     )
                    Plaintiff   )
                                 )
        v.                       )        Case No. 08-1243
                                 )
BNSF Railway Company,            )
                    Defendant    )

## ORDER

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court are the Plaintiffs' motion in limine (#71) and Defendant's motions in limine (#80 and 81). The motions are fully briefed, and I have carefully considered the parties' arguments.

### PLAINTIFF'S MOTION #71

Plaintiff asks the Court to exclude or limit five categories of evidence, as follows:

#### *Defendant's Medical Expert's Testimony*

Plaintiff states that Defendant retained Dr. Douglas Martin as an "adverse medical expert." Dr. Martin is an occupational medicine specialist who treats patients suffering from work injuries, with the goal of returning them to work. Several of Dr. Martin's opinions are challenged in this part of the motion.

The first challenged opinion occurs in Dr. Martin's written report, in which he states that "the claimed incident of hitting a train low spot...is not a *proximate cause* of the C5-6 disk abnormality which subsequently led to this gentleman's cervical operation." [emphasis added] Dr. Martin's Report is attached as Exhibit 2 to Attachment 2 to Motion in Limine #71.

1

Plaintiff argues that this conclusion regarding proximate cause must be barred for 3 reasons. First, this is a legal conclusion, which cannot be offered by experts in this Circuit, citing <u>Haager v. Chicago Rail Link, 232</u> F.R.D. 289, 294 (N.D.Ill.2005). Second, proximate cause is not the standard in FELA cases. See Seventh Cir. Pat. Jury Instr. 9.02 (2009). Third, the term is a legal term of art would be confusing to a jury.

Defendant characterizes Dr. Martin's use of this terminology as "fortuitous," pointing out that the conclusion was drawn only after a description of Dr. Martin's review of medical records, medical depositions and an IME.

Despite its statement as a legal conclusion, the context clearly shows that Dr. Martin intended this conclusion to be a conclusion of *medical* causation, not legal causation. He did not himself raise any legal issues and disclaimed knowledge of what legal causation applied in FELA cases. His medical conclusion is based on sufficient medical data to be admissible. This is nothing like the expert's opinion in <u>Haagar</u>, or the opinion rendered in the case on which Haagar relied, <u>Good Shepherd Manor Foundation Inc. v. City of Momence</u>, 323 F.3d 557, 564 (7th Cir. 2003)(expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible).

Plaintiff is correct that "proximate" cause is not the applicable standard in a FELA case and that allowing this conclusion as stated would be confusing to the jury. Exclusion of the entire testimony, however, is a far more extreme measure than is necessary to resolve this issue. Dr. Martin simply cannot use - orally or in writing - the word "proximate" in conjunction with the word "cause" or "causation." If Dr. Martin's report is admitted - an issue not presented here - the word "proximate" must be redacted. If Dr. Martin used this term in his deposition, it must be edited out.

The second opinion of Dr. Martin that Plaintiff wants barred is his opinion regarding Bratek's

ability to return to work, either generally or for BNSF specifically. In his report, Dr. Martin included no opinion on this issue. At his deposition, Plaintiff asked him if he had an opinion regarding Bratek's ability to return to work. He said he did not and that he had not been asked to form such an opinion. Following up, Defendant elicited that Dr. Martin thought Bratek "probably" could return to "some gainful employment."

Plaintiff asserts that Dr. Martin lacks foundation to so opine and further that Defendant failed to disclose his opinions on this topic. Defendant addresses the foundation argument based on Dr. Martin's credentials, and on the basis of those credentials, I find no basis for excluding his testimony.

Defendant does not address, however, the failure to disclose this opinion except to say that the opinion was elicited by Plaintiff's own questioning, so surprise and prejudice cannot be claimed. Fed.R.Civ.P. 26 (a)(2)(B)(i) requires that the written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Failure to disclose or supplement bars a party from using that information, Fed.R.Civ.P. 37(c)1), regardless of what happened at the deposition or whether there is surprise or prejudice. Dr. Martin may not opine on Bratek's ability to return to work.

### _Defendant's assertion that Bratek failed to mitigate damages_

BNSF has asserted that Bratek failed to take reasonable steps to return to work or to utilize his employer's return-to-work program. In support of this affirmative defense, Defendant has taken the deposition of one of its Regional Field Managers for the Medical and Environmental Health Department, Chris McGinnis. He testified about the lack of communication between Bratek and his vocational rehabilitation expert and this department, as well as about Bratek's lack of interest in taking a test for a supervisor's position. Plaintiff responds that BNSF bears the burden of showing

that Bratek failed to take reasonable action to lessen his damages. Plaintiff claims defendant cannot do so, but whether BNSF's evidence is sufficient to show reasonableness is a question for the jury.

Plaintiff next asserts that the defendant must show that there was a particular job available, that he was physically capable of holding that job, and that the job was not transitory. Plaintiff asserts that there is no such evidence. This is not a question that need be addressed before the trial. BNSF may put on the testimony of McGinnis. Whether this is sufficient to send the question of mitigation to the jury is a matter that will be taken up at the conclusion of the trial, during the jury instruction conference. At this time, the motion is denied.

### *Workers' Compensation*

Plaintiff next asserts that the jury should be told that plaintiff's injuries are not covered by the state worker's compensation statute. Defendant disagrees.

The jurors will be properly instructed on the FELA statute and its protection of railroad workers such as the Plaintiff. There is absolutely no need to introduce an entirely irrelevant statute into this trial. There may be no mention of state workers' compensation statutes.

### *Residence of Plaintiff and counsel*

Plaintiff asks that Defendant be barred from referring to the fact that neither Bratek nor his counsel are from Illinois. It will be unavoidable that the jury will learn that Bratek lived in Iowa, reported to supervisors in Iowa, or was treated by providers in Iowa. Certainly I will not allow any negative connotation to be attached to such information, but it need not be barred. With respect to the state where Plaintiff's attorney practices, I see no reason why that should come up at all, beyond the introduction that I will make to the jurors at the outset of the case. No further reference to that fact need be made during the course of the trial.

Plaintiff asks that BNSF be barred from offering evidence to any past, unrelated instances in which BNSF disciplined Bratek. BNSF did not respond to this part of the Motion. I therefore assume there is no objection. See CDIL Local Rule 7.1.

Discipline of Bratek that is unrelated to the issues in this case is marginally probative and probably completely irrelevant. Moreover, such evidence would inject a significant likelihood of prejudice which clearly outweighs any value at all. Such evidence may not be introduced. See, Fed.R.Evid. 402 and 403.

As stated herein, Plaintiff's motion is granted in part and denied in part.

## DEFENDANT'S MOTION #80

In this motion, BNSF asks the Court to bar the Plaintiff from using or mentioning certain email communications. These emails were the subject of questioning of Chris McGinnis, who is BNSF's Field Director for Medical and Environmental Health. McGinnis' job duties involve efforts to return injured employees to work. Part of those efforts involve giving them the opportunity to take a "first line supervisor test." ("FLS test") to assess whether an employee can move from one position into a supervisory position, presumably because it would entail fewer physical demands.

These emails are dated in 2001 and 2002; copies are attached as exhibits to Defendant's Motion in Limine.

The earliest email, dated June 29, 2001, is addressed to Amanda Bambrell, apparently someone in the HR department. The email expresses BNSF's Claims Department's "frustration" with the "current process of getting job offers" to injured employees who have brought FELA suits seeking all future lost wages and benefits. The email references an earlier meeting at which this issue

was discussed, leading to a consensus among the participants that a separate procedure was needed for testing these employees that "focused solely on the specials [sic] needs & requirement of injured-on-the-job employees, and the financial benefits that could be gained by making bona fide written job offers" to them.

In an undated response, Amanda offers 3 comments. The first one considers whether the internal application form could be "flagged" so that "H.R. can easily identify voc rehab client applicants." Second, she suggest that it would be [legally?] justifiable to offer the FLS to injured employees immediately upon determination that a permanent restriction "precludes them from performing their regular job." Finally, she conveyed a discussion from an earlier meeting in which H.R. discussed "in detail" how H.R. employees could be used as fact witnesses when an employee fails the FLS test. According to the discussion, these H.R. employees take "copious notes" during the test and conveyed the information that employees taking the FLS test often "present themselves very badly." This section of the email goes on to state that if the employee fails in the leadership portion of the test, H.R. mails them a letter that tells them how to improve their skills in this area and that offers training to coincide with this suggestion. If the employee fails the "in-box" portion of the test, community college courses in time management and priority setting are offered. She concludes that most injured employees "reject" both of these offers.

In another email, this one dated Feb. 6, 2002, Amanda points out "the problem," namely that FELA claims are "up 20M this year" and it was believed that this was due to "not being able to directly offer positions to employees in litigated cases." Following a very brief summary of the cost analysis supporting that conclusion (that estimated savings for offering a job was $250,000 per case), she then assessed her view of the reality of making such offers. She concluded that field H.R.

employees "resoundingly" denied having interviewed injured employees that "they felt would be an asset to this company as a first line supervisor." She concludes by suggesting that BNSF "really look into the reality of numbers and people assessment" and by asking whether it was true that "there are no injured employees that are promote able?"

The next two emails, both dated February 13, 2002, concern a flow chart called the "Voc Rehab Process Flow Draft." The first email seeks feedback to the chart, and the response provides one instance of some feedback. The feedback expresses concern that the flow chart makes it appear that the process is a "claim controlled process, cutting out medical altogether." In addition, it was pointed out that the flow chart was missing several flow lines.

BNSF first asserts that the these emails do not reflect the status or structure of the return to work program as it currently exists, nor do they deal with job opportunities that might be available to Bratek. McGinnis, in his deposition, testified that he was unfamiliar with the practice of using H.R. employees as fact witnesses in litigation. This process has not been used in any way with respect to Bratek's claims or efforts to return him to work or take the FLS test or any other matter in connection with this case.

Plaintiff, on the other hand, vigorously argues that these emails and McGinnis' testimony about them are crucial to the issue of mitigation of damages. Moreover, Plaintiff points out that Bratek was sent offers to take the FLS test and was sent postings for FLS jobs. Chris McGinnis, who coordinated between the claims and H.R. departments, is being used as a fact witness in this case.

These emails are relevant to the defense of mitigation, raising questions about the legitimacy of the job offers and promotional testing that BNSF offered to Bratek. There are certainly avenues that should be vigorously explored on cross examination, but those questions go to the weight to be

accorded to these emails, and not to their admissibility.

This motion is DENIED.

## DEFENDANT'S MOTION #81

Defendant's Motion contains 7 parts, each part seeking exclusion or limitation of a number of categories or pieces of evidence or testimony. Defendant has numbered the main parts with Roman numerals and the subparts with Arabic numerals. The Court will adopt that same numbering.

## PART I

Plaintiff has not objected to some parts of this motion, and the motion is therefore granted as to the following:

1. Claims of damages or injury to Plaintiff's spouse
3. Reference to BNSF's liability insurance or indemnity
5. Reference to incurrence or payment of medical or hospital bills
7. Reference to Plaintiff's financial condition
8. Reference to the size of BNSF's law firm or the number of attorneys
9. Evidence of other lawsuits or claims against BNSF
10. Reference to the fact that the law firm regularly represents BNSF in other lawsuits or represents corporations or persons insured by insurance companies.
11. Reference to punitive or exemplary damages or to sending a message to BNSF
12. Reference to settlement discussions
13. Reference to this or any other motion in limine filed by BNSF

Plaintiff does object to the following parts of the motion in limine.

## *2. Workers' Compensation*

Defendant asks this court to bar any reference to this case as a worker's compensation case or any argument that Plaintiff has not received "compensation" for the for the incident or his injuries. In support, Defendant cites a 1965 case from the Second Circuit and a 1957 case from the Third Circuit. Plaintiff opposes the motion with no citation to authority.

The jurors will be properly instructed on the FELA statute and its protection of railroad

workers such as the Plaintiff. There is absolutely no need to introduce an entirely irrelevant statute into this trial. There may be no mention of state workers' compensation statutes.

### *4. BNSF's size, corporate structure, ownership, solvency or ability to pay a verdict*

Plaintiff states that it has no intention of introducing any such evidence or making any such arguments but suggests that BNSF may open the door during trial. If that happens, then this ruling will obviously be subject to reconsideration. Unless and until it does, however, this type of evidence has no relevance whatsoever to this case.

### *6. Congressional intent or purpose of FELA*

The jurors will be properly instructed on the applicability of FELA to the facts in this case, based on the language of the statute and regulations and case law interpreting them. There is no need to delve into congressional intent of this century-old case, and its purpose is properly stated in the jury instructions. There may be no such argument or testimony.

### *14. Unproduced or missing documents*

Plaintiff states that the jury should be advised that properly-requested but un-produced documents are missing because BNSF refused to produce them. This statement misapprehends federal practice. If a request for documents went unanswered and no motion to compel was filed during the discovery period, it is too late to bring it up now. The Court will not allow any type of missing evidence argument or instruction under those circumstances.

### *15. Inspection of track*

The parties disputed earlier in the case whether Plaintiff's expert should be allowed to inspect the track and, if so, what limitations there might be on such an inspection. The Court resolved that dispute by Order, and the inspection proceeded. BNSF asks the Court to bar evidence, testimony or

argument that BNSF would not allow the inspection without an order. Plaintiff responds that the jury should be advised "why [the expert's] inspection was limited and how BNSF resisted Bratek's efforts to inspect the site."

Limitations on the inspection were placed by the Court, after full consideration of the arguments and concerns of both parties. These limitations were not imposed by BNSF, and any suggestion to the contrary - by evidence, testimony or argument - is prohibited. Plaintiff has not explained in any way how his expert's inspection suffered by any of these limitations, so there is no basis at this time for allowing this type of argument. If this changes at trial, Plaintiff may of course re-raise this issue.

**PART II**

BNSF argues that Count III of Plaintiff's complaint (which is a claim that BNSF violated the Federal Track Safety Standard, 49 C.F.R., part 213, subsection 213/5) can only succeed with a showing of actual or constructive notice of an alleged track defect before there can be liability. As Plaintiff acknowledges, that statement is a correct statement of the law that governs Count III.

Defendant jumps from that correct statement to the conclusion that Plaintiff should not be permitted to argue that a violation of this Regulation constitutes per se negligence. There are several problems with this conclusion.

First, this is not a proper motion in limine. It is dispositive of a claim and should have been raised in the motion for summary judgment that was filed. Using motions in limine as an attempt to avoid the deadlines imposed by a scheduling order is frowned upon. See, e.g., <u>Kimball ex rel. v. RJ Reynolds Tobacco Co.</u>, 2006 WL 1148506, 1 (W.D. Wash.,2006); <u>Chiropractic Alliance of New Jersey v. Parisi</u>, 164 F.R.D. 618, 622 (D.N.J.,1996); <u>McClain v. Norfolk Southern Rwy. Co.</u>, 2009

WL 701001, 1 (N.D. Ohio 2009); <u>Rosario v. Valdes</u>, 2009 WL 921290, 1 (D. Puerto Rico,2009). There is also a substantive difference between motions in limine and dispositive motions under Fed.R.Civ.P. 56. See discussion in <u>Dunn ex rel. v. State Farm Mut. Auto. Ins. Co.</u>, 2009 WL 5171798, 7 (E.D. Mich.,2009)(collecting cases).

Second, no authority at all is cited for this proposition, and no argument is made. Defendant simply states the conclusion, which does not necessarily follow from the regulation. "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." <u>Tyler v. Runyon</u>, 70 F.3d 458, 464 (7th Cir. 1995). See also, <u>United States v. Haddon</u>, 927 F.2d 942, 956 (7th Cir.1991) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim.").

Finally, as Plaintiff points out, actual or constructive knowledge that the track violated a regulation is what he has to prove. Once that knowledge has been proven, BNSF is strictly liable. this matter of law will be included in the jury instructions and on the verdict form if sufficient evidence of knowledge is produced to send this matter to the jury. Both parties will be allowed to argue this point to the Court at the jury instruction conference. If I decide that Count III will go to the jury, Plaintiff will be able to argue this point. Of course the converse is also true: if I decide that the evidence of knowledge is insufficient to send Count III to the jury, Plaintiff will not be allowed to argue this point. It is premature to rule on this matter at this time.

**PART III**

Defendant points out that Plaintiff has conceded Count II, the claim originally made under the Locomotive Inspection Act. As a result of that concession, Defendant asks that evidence, testimony and argument as to the locomotive, its parts, its seats, its cab or any other part did not

comply with that statute. To that extent, Plaintiff does not oppose the motion.

Plaintiff goes on to say that the intent of this part of the motion is unclear and that if Defendant is "delving into other areas," BNSF should be ordered to fully brief those areas. I find no true ambiguity here, but in order to eliminate any question, any evidence, testimony or argument that is relevant solely to the now-dismissed LIA claim is barred. If there is evidence that is also relevant to the remaining two claims, this Order does not bar its introduction.

**PART IV**

This part of the motion was filed separately (as Doc. #80). It has been discussed separately above.

**PART V**

In this part of the motion, BNSF seeks to bar six categories of testimony by Plaintiff's track expert, Joe Lydick, as follows:

### *1. Track conditions between Chicago and Fort Madison, Iowa*

The event that gave rise to this lawsuit occurred at a specific place, namely MP125.9. Plaintiff asserts that track conditions "in the same area" are relevant because they provided notice to BNSF that there were track problems "in the area." These conditions, according to Plaintiff, are directly relevant for purposes of establishing constructive notice, an essential element of one of the claims.

The precise location of the incident is known and is not disputed. Track conditions miles away from that location would only provide notice of a defect somewhere else, not at MP 125.9. As was the case with the site inspection previously allowed in this case, the expert's testimony about track conditions is limited to one-tenth of a mile in each direction of MP 125.9.

### *2. Track conditions at the site*

Lydick's testimony is expected to include information about the "general conditions" in the area of the accident, including BNSF's lack of maintenance, inadequate inspections, and need for repairs in that area.

Defendant asks that Lydick be barred from testifying about conditions such as cross level, warp or gauge, as none of these conditions are at issue in this case. The only identified conditions at the location of the incident are Dip 31 and left/right profile. Plaintiff asserts that these avenues of inquiry are relevant to the primary issues in the case and "may have an impact on the other track issues in this case."

If conditions within one-tenth mile in either direction from MP 125.9 include cross level, warp or gauge, or any condition other than Dip 31 and left/right profile, Lydick may include discussion of those conditions in his testimony. Otherwise, his testimony is limited to the two identified conditions at the location of the incident and one-tenth mile in each direction.

### 3. Whole body vibration

Defendant states that Lydick's Report includes an entire section on "whole body vibration." Defendant asserts - without any discussion - that this condition is not alleged or at issue in this case. Plaintiff's response - without any discussion - is that his Report "discusses a variety of issues" under the heading "Human Exposure to Whole Body Vibration."

The lack of specific argument by Defendant leaves the Court with no basis to bar the testimony at this time. Plaintiff is cautioned, however, that if there is no evidence tending to make a direct connection between Bratek's injuries and "whole body vibration," then this part of Lydick's testimony is irrelevant and inadmissible. Before this testimony will be allowed, there must be some evidence showing its pertinence to the issues in this case. The general references in Plaintiff's

response are insufficient to make such a direct showing. At trial, more will be expected.

## *4. BNSF Manuals after December 2006*

On the surface, it would appear that manuals published after the date of the incident in question would be completely irrelevant to the issues in the case. Plaintiff, however, has pointed to some testimony that parts of the 2009 manuals are, at least in some pertinent respects, identical to parts of the earlier manuals. In addition, Plaintiff assures the Court in his response that Lydick will be relying on materials produced by BNSF's expert at his deposition, materials not yet produced when Lydick prepared his report.

To the extent that Lydick is relying on materials he received from BNSF after his report was prepared, BNSF cannot claim to be surprised that his actual testimony about what he relied on might change from that formal report, assuming of course that Plaintiff properly supplemented his disclosures. See Fed.R.Civ.P. 26(e)(2). With this assumption and with the implication derived from Plaintiff's response that Lydick will be testifying live and not by deposition, there is no basis for barring the testimony at this time. It may, of course, appear differently at trial when the evidence is actually before the Court.

In addition, it is not at all clear that all parts of the manuals on which Lydick will rely are either the pre-incident manuals or parts of post-incident manuals that are identical to the corresponding parts of the pre-incident manuals. If the later manuals are not identical to the earlier ones, then the later ones have no relevance at all to the standards that governed BNSF at the time of the incident. Use of post-incident manuals under that circumstance is barred.

## *5. Kevin Chantry's measurements of the area*

Defendant asserts that Plaintiff should be barred from offering testimony challenging the

method used by Kevin Chantry's measurements taken of the area immediately after the incident. According to defendant, there are no allegations that BNSF was negligent in assessing the condition of MP 125.9 after the occurrence, so Chantry's measurement techniques have no bearing on any alleged misconduct by BNSF, and Lydick's testimony challenging Chantry's technique is irrelevant. Plaintiff responds that the condition of the track immediately after the incident is of course relevant and the federal regulations require that accurate track measurements must be taken either "under full load or the deviation from a full load must be added to the deviation taken without a full load.

Defendant's assertion goes to the weight of Lydick's testimony, not to its admissibility. The condition of the track shortly *after* the incident is illustrative of the condition of the track shortly *before* the incident. If BNSF mis-measured those conditions, Plaintiff is entitled to bring that up. Whether it goes to all the issues identified by Plaintiff in the response is a matter of argument, not law.

### *6. Lydick's inspection of the site*

Defendant asks that Lydick be barred from testifying about his own inspection at MP125.9, other than to describe the geography and topography, because his inspection occurred nearly four years after the incident. Any activities of BNSF employees, any repairs made to the site, and any statements made by BNSF employees during the inspection have no relevance to what was occurring four years earlier. No legal authority is provided for this argument.

Plaintiff responds that, under Fed.R.Evid. 407, subsequent remedial measures are inadmissible to prove negligence, but they are not inadmissible to prove other matters. Citing a 1972 case from the Fifth Circuit, Plaintiff asserts that the use of subsequent remedial measures can be used to prove the condition of the track and track surface at the time of the incident. This is because,

according to Plaintiff, the soil and water conditions in the area that affected the track at the time of the incident are still affecting the track at MP125.9. The repairs made - and statements made by BNSF employees - go to the issue of whether BNSF had notice of defective track conditions at the time of the incident.

The parties have muddled together several different arguments. Plaintiff certainly cannot use its expert to offer testimony that the track must have been defective at the time of the incident because repairs had been made at the time of the expert's inspection. Clearly such testimony is inadmissible under Fed.R.Evid. 407.

But defendant concedes that Lydick can testify about the "geography and topography." To the extent that the expert's testimony is based on soil and water conditions that were present at his inspection and that he has somehow learned were present at the time of the incident, his testimony falls within the categories of geography and/or topography.

Defendant provides no basis for its assertion that statements by BNSF employees who were at the inspection are inadmissible. Without knowing the substance of the statements, when they were made, the context in which they were made, or the purpose for which they are being asserted, it is not possible to determine if they are hearsay or some exception thereto, or whether they are inadmissible on some other ground. The statements are not barred at this time, but this matter may be re-raised at trial should it prove necessary.

**PART VI**

BNSF seeks to bar certain testimony of Plaintiff's economic expert Thomas Ireland, as that testimony relates to Plaintiff's alleged loss of household services. At his deposition, Ireland stated he lacked sufficient information to calculate a specific dollar amount. He could not determine how

much time Bratek spent providing household services. He did not know what amount could be charged or assumed as an appropriate wage for household services, generally or in Fort Madison, Iowa, and he admitted he had not looked up that information.

Plaintiff responds that this is a "foundation" objection and that the proper foundation will be laid at trial through Bratek's testimony, Bratek's wife's testimony and "materials in the possession of Dr. Ireland." From this statement, Plaintiff concludes that BNSF's motion is premature because foundation issues can be raised at trial.

If Bratek were a lay witness, Plaintiff's point might be well taken, but Bratek is not a lay witness. He is offering expert opinion testimony. His testimony is therefore governed in significant part by Fed.R.Civ.P. 26(a)(2), which requires that an expert disclose not only his opinions but also "the basis and reasons" for those opinions. It is apparent from Dr. Bratek's deposition testimony that the basis and reasons for his opinions about loss of household services have not been disclosed. Plaintiff is therefore barred from using those opinions at trial. Fed.R.Civ.P. 37(c).

## PART VII

BNSF next moves to exclude certain of Bratek's own testimony about 3 topics.

### *1. Track Conditions*

BNSF is concerned that Bratek will testify about the repairs made to the track after this incident, implying that prior repairs had been improperly completed. There are several aspects to this concern.

First, as was held above with respect to the expert, Plaintiff himself cannot testify that, because repairs were made after the incident, the track must have been defective at the time of the incident or that earlier repairs to the track at MP125.9 were improperly (read, negligently) made.

Such testimony is inadmissible under Fed.R.Evid. 407.

Plaintiff notes that Fed.R.Evid. 407 allows evidence of subsequent repairs "for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." He argues that Bratek's testimony could be used to prove that BNSF had notice of defective conditions, what the condition of the track was at the time of the incident, the feasibility of repair, or for rebuttal or impeachment.

It does not follow that Bratek's testimony about subsequent repairs would demonstrate the condition of the track at the time of the incident, nor would his testimony about those repairs *after* the incident tend to show notice to BNSF of the need for repair *prior to* the incident. If BNSF brings up the feasibility of the repairs or offers testimony that Bratek can impeach by testifying about the subsequent repairs, then he can of course offer such testimony. Unless and until that happens, however, the testimony is impermissible.

There is also a suggestion that Bratek may testify about repairs that were made *prior to* the incident. This testimony is not prohibited by Rule 407. If Bratek has personal knowledge of those repairs, he can offer his observations about the prior repairs. Comments about the efficacy of any such prior repairs must be limited to his own personal knowledge, based on his observations before the incident, of the conditions of the track at MP125.9 prior to the incident.

BNSF also suggests that Bratek's testimony about the repairs made before the incident might include a comparison of those repairs with the ones made after the incident. BNSF asserts that such testimony would also be barred by Fed.R.Evid. 407 because its only purpose would be to suggest that the prior repairs were negligent. Rule 407 prohibits the use of evidence of subsequent repair to prove negligence. I can see no other reason such comparative testimony would be offered.

## *2. Bratek's conversation with Glen Moulder*

During his deposition, Bratek testified about a conversation he had with former Road Foreman of Engines Glen Moulder. That conversation, according to Bratek, involved Moulder saying that "that would give you quite a bounce if you hit it at track speed." Defendant asserts that this is hearsay not subject to any exception. Plaintiff responds that it is an admission of a party opponent, and therefore admissible under Fed.R.Evid. 801(d)(2)(c).

Neither party has provided one iota of authority beyond the language of Fed.R.Evid. 801 to justify its position. The question is whether Moulder was a "person authorized" by BNSF to make this statement or "an agent or servant concerning a matter within the scope of his employment." The contents of the statement are not sufficient, without more, to establish either authority or agency under this Rule. Id.. Plaintiff asserts, again without authority, that Moulder's position at BNSF gave him "authority" to make a statement about the condition of the tracks. Implicit in BNSF's motion is its position that Moulder did not have the requisite authority. In other words, there is not enough information in the motion to determine whether or not Moulder had authority or was an agent authorized to speak on this matter.

Moreover, the content of this conversation as reported in the deposition is such that it cannot be considered an admission. The statement does not describe "what" would give you quite a bounce - the specific condition at MP 125.9? hitting a low spot in general? or something else entirely. These unknowns preclude a ruling at this time. If Bratek intends to testify about this conversation, the content of his proposed testimony must be made in the form of an offer of proof before it is put before the jury. At that time, counsel may also make their arguments about authority and agency.

### *3. Plaintiff's medication Lyrica*

After the incident, Plaintiff took a prescription drug Lyrica for pain, which might have affected his alertness or attentiveness. He testified that he told BNSF about this drug usage and was nonetheless allowed to work. BNSF asks that this testimony be barred, as irrelevant to the liability issues in this case and as unduly prejudicial because it suggests improper work practices that have nothing to do with the case. Plaintiff responds that the "effects of medication which are directly related to the accident are clearly relevant under rules 401 and 402 and there is no unfair prejudice under Rule 403."

Plaintiff makes no effort whatsoever to explain how the use of Lyrica is relevant to any issue in this case. Testimony on this matter is barred.

### *4. BNSF's policy regarding days of missed work*

In his deposition, Bratek testified that he was required to work a certain number of days when he returned to work after the incident. He stated that BNSF can discipline, even fire, employees if they don't work enough days to comply with what was called the Availability Policy. According to BNSF, this has no probative value - Bratek was neither disciplined nor threatened with discipline - and any marginal value the information might have is outweighed by prejudicial effect, although BNSF does not articulate what that prejudicial effect might be. Plaintiff responds that this testimony shows that future lost wages are "nearly guaranteed because he would have been forced to work a minimum number of days to keep his job." In addition, Plaintiff contends that, had Bratek returned to work at BNSF, he would have been subject to this policy, meaning that he would not be allowed to miss days when he was physically unable to work.

BNSF has contended that Plaintiff was able to return to work, either at BNSF or elsewhere.

If BNSF has a policy that would apply should Bratek return to work there, then the policy is at least marginally relevant to a consideration of Bratek's damages. Given the BNSF has articulated no prejudicial effect - and I can see none that cannot be addressed on cross examination - there is no reason to bar this testimony.

**PART VIII**

BNSF asserts that Plaintiff should be barred from putting on any evidence, making any argument or referring in any way to BNSF internal standards or rail industry standards postdating December 27, 2006. This issue was previously addressed, at least partially, in PART V, subpart 4 above. As was ruled above, if the post-incident internal BNSF or rail industry standards are not identical or substantially material in relevant respects to pre-incident standards, then the post-incident standards have no relevance at all to the standards that governed BNSF at the time of the incident. Use of post-incident manuals under that circumstance is barred.

This motion is granted in part and denied in part.

**CONCLUSION**

As stated in this Order, Plaintiff's motion (#71) is GRANTED IN PART AND DENIED IN PART; Defendant's Motion (#80) is DENIED; and Defendant's Motion (#81) is GRANTED IN PART AND DENIED IN PART.

ENTERED ON May 13, 2011

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE
